UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR 12-0763 CAS | | Date | April 8, 2013 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |
| Catherine Jeang | | Not Present | | Aron Ketchel, Not Present |
| *Deputy Clerk* | | *Court Reporter/Recorder, Tape No.* | | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| ROGELIO MAURICIO HARRIS | NOT | X | | SONJA AUGUSTINE, DFPD | NOT | X | |

| Proceedings: | **(IN CHAMBERS): DEFENDANT'S MOTION TO SUPPRESS** (filed February 22, 2013) [Dkt. No. 42.] |
|---|---|

## I.   INTRODUCTION

Defendant Maurico Harris is charged in a two-count indictment with knowingly possessing with intent to distribute at least two pounds of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), and with attempting to export same, in violation of 21 U.S.C. § 963, 953(c), 960(a)(1), (b)(1)(H).  The First Superseding Indictment charges defendant with aiding and abetting co-defendant Richard Thomas Dyer with the aforementioned offenses.  Dkt. No. 43.

On February 22, 2013, defendant filed a motion to suppress statements and evidence allegedly obtained in violation of the Fifth Amendment to the United States Constitution.  Dkt. No. 42.  The government filed an opposition on March 18, 2013.  The Court held an evidentiary hearing on April 29, 2013, at which Customs and Border Patrol Officer Gerardo Aguirre and Homeland Security Investigations ("HSI") Special Agent Matthew Hernandez testified.  After considering the parties' arguments, the Court finds and concludes as follows.

## II.   BACKGROUND

On July 27, 2012, Harris checked in at a Delta Airlines ticket counter at the Los Angeles International Airport ("LAX") for a 1:05 p.m. flight destined for Tokyo, Japan.  He checked a single suitcase and was provided a boarding pass marked "DOCS-OK" after showing his passport to the ticketing agent.  Harris then proceeded to his departure gate and remained there from approximately 10:30 a.m. until approximately 12:15 p.m, at which time plaintiff boarded the plane and took his seat.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

According to Customs and Border Patrol ("CBP") Officer Gerardo Aguirre, on the morning of defendant's departure, he reviewed passenger itineraries for passengers traveling on outgoing flights and identified certain checked bags he sought to inspect. Decl. of Gerardo Aguirre ¶ 4. Aguirre testified at the hearing that he determined which bags to inspect depending on whether a passenger had paid in cash or had a criminal record; he identified defendant as one of the passengers with a criminal record.[1] Aguirre identified three passengers whose luggage he sought to inspect, but according to Delta, only two of these passengers had checked any bags. Id. ¶ 5. Aguirre then proceeded to examine the checked luggage for both of these two passengers in the "interstitial area" of the airport. He testified that he was looking to see if any laws had been broken or if he the luggage contained any illegal contraband.

First, Aguirre found no contraband in the luggage that was identified as belonging to the other passenger. Id. ¶ 6. Turning to the black suitcase identified by Delta as the luggage that defendant had checked, Aguirre confirmed that the luggage tag attached to the bag had defendant's name on it. He then opened the suitcase and observed clothes, a laptop, and a sealed cardboard box labeled as containing "Snickers" candy bars. Id. ¶ 7.

When Aguirre lifted the box, he noticed that it seemed unusually heavy. Id. ¶ 8. Upon opening the box, Aguirre observed numerous individually-wrapped items in what appeared to be Snickers' bar wrapping. These bars were also heavier and larger, in Aguirre's experience, than a standard Snickers bar. Id. ¶ 9. Aguirre then punctured one of the bars, revealing a white crystalline substance. Id. Testing confirmed that the substance was "presumptively" methamphetamine. Id. Officer Aguirre testified that he did not know that the bag contained contraband at this time, but that he "suspected" that it did.

Thereafter, Officer Aguirre contacted CBP Officers Beremill Alvero and Virgil David and requested that they detain defendant prior to defendant boarding his scheduled flight to Tokyo. Id. ¶ 10. After repackaging the Snickers box and closing the luggage, Aguirre proceeded to defendant's departure gate and arrived there about 12:15 p.m. Id. ¶ 11.

---

[1] Defendant disputes whether Officer Aguirre did in fact know that he had a criminal record prior to pulling his bag for inspection, noting that a "TECS II - Person Subject Display" report indicating his prior arrest was obtained at 15:44, or 3:44 p.m. Agent Hernandez testified that this report was likely obtained at 3:44 p.m. Pacific Standard Time, as opposed to Central Time—in any event, after Officer Aguirre pulled defendant's bag. It is also unclear if Officer Aguirre asked Delta Airlines to run a report for travelers who purchased their tickets in cash.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Because defendant had already boarded his flight by this time, Officers Aguirre and Alvero proceeded to defendant's assigned seat and asked him for his passport and boarding pass. Id. ¶ 12. Aguirre testified that defendant was in his seat when the officers approached him. After confirming defendant's identity, Aguirre informed defendant that he had to deplane with them and answer questions about his trip. Id.; Decl. of Rogelio Mauricio Harris ¶ 3. Defendant collected his belongings and Officer Alvero handcuffed defendant in the aisle near his seat; Aguirre states that this measure was taken as a safety precaution to protect the officers. Aguirre Decl. ¶ 13. Aguirre testified that defendant agreed with his request to come with the officers, did not make a scene or yell, and that Officer Aguirre was not "afraid" of defendant. However, Aguirre testified that he felt that some officer safety was needed because he did not know how defendant, a suspected drug smuggler, would respond to law enforcement, and that therefore handcuffs were appropriate.

At approximately 12:20 p.m., the officers and defendant met up with Officer David on the jetway, where defendant was patted down for weapons while still handcuffed. Id. ¶ 14. Defendant was then asked various questions regarding where he was traveling, the purpose of his travel abroad, and whether he had checked any luggage—a "standard set of questions for international travelers," formally known as the "binding declaration." Id. Defendant replied that he was traveling to Japan to visit his girlfriend and other friends and that he had checked a single bag. Id. Defendant was then informed that Aguirre needed to ask him additional questions about his trip, and that defendant would need to come with the officers to another location. Id. ¶ 15.

Defendant notes, however, that the Customs Incident Report dated August 17, 2012, and Immigration and Customs Enforcement ("ICE") Report of Investigation #17 ("ROI") from August 21, 2012, do not indicate that Officer Aguirre searched defendant's luggage before seeking to have him detained. See Def.'s Exs. B & C. The only inspection of defendant's luggage noted in these reports took place after Harris had been taken off of the airplane and transported to a secondary location. See id. At that time, according to these reports, defendant acknowledged ownership of the luggage in question, and the officers first found the Snickers bars containing methamphetamine. Def.'s Ex. B at 4. However, according to the more recent ICE ROI #28 and Officer Aguirre's statement, Officer Aguirre first discovered the methamphetamine in the luggage in question prior to detaining defendant. Def.'s Ex. D at 2–3.

According to Officer Aguirre, the officers transported defendant by van across the tarmac to an interview room in the CBP Field Office in the Tom Bradley International Terminal ("TBIT"). Id. ¶ 16. Defendant arrived there at approximately 12:38 p.m, where his handcuffs were removed for the first time and his luggage was placed on the table. Id. ¶¶ 17–18. Officer Aguirre then asked defendant a number of the same questions regarding his intended destination and purpose for his travel. Defendant repeated that he was traveling to Japan to visit his

girlfriend and other friends. Id. Officer Aguirre next asked defendant if the luggage was his and whether defendant packed the luggage himself, to which defendant replied "yes." Id. ¶ 19. Officer Aguirre then opened the luggage on the table, removed the Snickers box, and asked defendant why he was traveling with a box of Snickers bars. Defendant replied that the bars were "for himself." Id. He did not ask defendant if he had packed any methamphetamine.

Still in defendant's presence, Officer Aguirre punctured one of the Snickers bars and removed a small amount of white crystalline substance from the bar. Officer Aguirre then performed a field test on the substance, which tested presumptively positive for methamphetamine. Id. ¶ 20. At this juncture, Officer Aguirre detained defendant for suspicion of attempted exportation of a controlled substance at approximately 12:47 p.m. Id. ¶ 21. Defendant was then taken to a detention room and handcuffed to a bench until agents from the ICE Homeland Security Investigations ("HSI") unit arrived to conduct a further interview. Id. ¶ 22. According to ROI #17, Officer Aguirre placed defendant "under arrest" at this time. Def.'s Ex. C at 2.

At 2:10 p.m., HSI Special Agents Matthew Hernandez and Donald Callahan arrived at TBIT and were advised of the methamphetamine recovered from the Snickers bars and defendant's prior statements and interviews conducted by Officer Aguirre. Decl. of Matthew P. Hernandez ¶¶ 4–5. Agents Hernandez and Callahan then began interviewing defendant at about 2:40 p.m. Id. ¶ 6.[2] Defendant stated in his declaration that only after the interview had concluded at 3:22 p.m. did he sign a waiver of Miranda rights card, at which time he was also arrested. Harris Decl. ¶ 5. Agent Hernandez, however, states that defendant was verbally advised of his Miranda rights before beginning the interview and presented with a copy of the ICE Statement of Rights form. Hernandez Decl. ¶ 7; see Def.'s Ex. G (reciting that defendant "signed this document at 1443 hrs"). Defendant initialed next to each right and signed the form, indicating his intention to his rights "freely and voluntarily." Def.'s Ex. G. Agent Hernandez left blank the section of the form indicating when defendant was taken into custody, because Hernandez did not yet consider defendant to have been arrested at the beginning of the interview. Id. ¶ 8. Despite the factual disagreement in these declarations, at the hearing, both parties agreed that defendant was advised of his Miranda rights prior to the interview with Agents Hernandez and Callahan.

During the interrogation, defendant provided additional information concerning his trip and his luggage to the agents. Id. ¶¶ 9–10. Defendant stated that he met the girlfriend he was intending to visit in Japan on an online dating site, and that she worked and lived in Hong

---

[2] Hernandez's handwritten notes indicate that the interview began at 1438 on July 27, 2012. Def.'s Ex. F.

Kong. Id. ¶ 10. Defendant further stated that a "friend" had purchased his airline ticket. Id. Agent Hernandez testified that defendant told him that he had "overheard" the officers discussing the fact that they had found methamphetamine in his luggage, but that defendant otherwise stated that he "didn't know what was in [his] bag." After defendant indicated that he wished to speak to an attorney, Agent Hernandez ended the interview. Id. ¶ 11. At that time, Hernandez filled in the blank on the Statement of Rights form indicating that defendant was "taken into custody" at 1522, or 3:22 p.m. Id. ¶ 12; Def.'s Ex. G.

IV. **ANALYSIS**

    A. **Suppression of Defendant's Statements**

Defendant seeks to suppress all of the statements he made from time he was confronted on, and removed from, Delta Flight 283 at approximately 12:20 p.m. In defendant's view, no reasonable person would have felt free to remain on the flight or decline to follow the three Customs officers' directions shortly before the airplane's scheduled departure. Therefore, according to defendant, he was under arrest from the moment he was approached by the Customs Agents, and he should have been advised that he was being taken into custody and of his rights to counsel. As such, any and all statements he allegedly made should be suppressed as violations of his Fifth Amendment right against self-incrimination. Moreover, defendant maintains that because he was presumed to be the owner of the luggage in question based upon his passport and boarding pass information seized by the Customs Officers, the luggage and all of its contents must also be suppressed as "fruit of the poisonous tree."

Under the Fifth Amendment, "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The obligation to administer the canonical Miranda warning, therefore, "extends only to those instances where the individual is 'in custody.'" United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002).[3]

---

[3] The Ninth Circuit has on occasion treated as "similar, if not identical" two distinct questions in criminal procedure. First is the question of when a detention becomes an "arrest" for purposes of the Fourth Amendment, such that probable cause is required; second, the determination of when a detained individual is "in custody" such that Miranda warnings must be provided before any interrogation of that individual. See United States v. Bravo, 295 F.3d 1002, 1009 n. 5 (9th Cir. 2002). However, the overlap is imperfect, for "whether an individual

**CRIMINAL MINUTES - GENERAL**

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury, 511 U.S. at 322 (quotations and alterations omitted). As the Ninth Circuit has framed the inquiry, the question is "whether a reasonable person in such circumstances would conclude after brief questioning that he or she would not be free to leave." United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). This inquiry depends "not on the subjective views harbored by either the interrogating officers or the person being questioned," but only on the "objective circumstances of the interrogation." Stansbury, 511 U.S. at 323. Relevant—although not dispositive—factors to consider include: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066. Generally, although an individual may briefly be detained and be unable to voluntarily terminate his encounter with the authorities, when an individual is subjected to more than routine or expected "inconvenience and delay," a Miranda warning must be provided before further interrogation can occur. See United States v. Butler, 249 F.3d 1094, 1099 (9th Cir. 2001).

Applying this test, courts have identified a number of specific instances where a detention does not give rise to custody. As a general matter, being briefly detained by law enforcement officers does not necessarily translate to an individual being "in custody" for purposes of Miranda. See Butler, 249 F.3d at 1098. Common scenarios where detention is not the equivalent of custody include traffic stops and a Terry stop-and-frisk.

In addition, the Ninth Circuit has recognized that "special rules apply at the border" in determining whether a detention rises to the level of a custodial interrogation. Butler, 249 F.3d at 1098. At the border, whether persons are coming to or leaving from the United States, "[s]tops and routine questioning are the norm." United States v. Leasure, 122 F.3d 837 (9th Cir. 1997); see United States v. Abbouchi, 502 F.3d 850, 855 (9th Cir. 2007) ("The border search doctrine applies equally to searches of persons and property exiting the United States as to those entering the country."). This doctrine applies not only at the physical border itself, but "at the border's functional equivalent," which includes an airport terminal when an individual is

---

detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for Miranda purposes" remain two discrete issues. United States v. Kim, 292 F.3d 969, 976 (9th Cir. 2002). Following the Ninth Circuit's lead, the Court will look to decisions rendered in both the Fourth and Fifth Amendment contexts while mindful of the potential for divergence in the respective doctrines.

**CRIMINAL MINUTES - GENERAL**

seeking to depart on an international flight. See United States v. Duncan, 693 F.2d 971, 977 (9th Cir. 1982).

In this case, there are multiple potential time points leading to defendant's formal arrest where the officers may have had to provide a Miranda warning before continuing to question defendant. The Court discusses each in turn.

### 1. Statements to Officer Aguirre on the Airplane

It is not clear to the Court whether defendant seeks to suppress any statements defendant allegedly made to Officer Aguirre when the officers approached defendant while he was seated on Flight 283 awaiting his departure. At the hearing, defendant agreed with the government that it was permissible to ask defendant basic identifying questions while he was on the airplane. On the plane, Officer Aguirre apparently asked defendant for his passport and boarding pass to confirm defendant's identity; after confirming his identity, defendant was told he would have to accompany the officers for further questioning at another location. It is unclear if defendant made any verbal statements or if Officer Aguirre asked any additional questions.

To the extent defendant made any statements before he was handcuffed and removed from the plane, the Court finds that these statements should not be suppressed. The officers clearly had a right to question defendant on the airplane to confirm his identity before handcuffing and removing him from the airplane, as before being taken from the plane, a reasonable person would have concluded that he would have been free to remain on the plane, as it were, after brief questioning by the officers.

### 2. Alleged Statements to the Officers in the Jetway

Defendant next seeks to suppress any statements he made when he was asked various questions by the officers on the jetway leading from the airplane.[4] In opposition, the government contends that this interrogation was a "routine" border interview, similar to questioning in a primary inspection area at the physical border, and therefore Officer Aguirre was not required to advise defendant of his Miranda rights before questioning him. Because a person generally is not "in custody" until after being moved to a "secondary inspection" area,

---

[4] Officer Aguirre did not offer any testimony at the hearing directly addressing whether he or the other officers present asked any questions of defendant while they were on the jetway, or whether defendant made any statements in the jetway. To the extent that any questions were asked, as Officer Aguirre testified to in his declaration, the analysis contained herein applies.

the government argues that defendant could not have been in custody on the jetway. Considering the relevant factors and the Ninth Circuit's guidance in this area, the Court concludes that the officers were permitted to question defendant without providing a <u>Miranda</u> warning in the jetway.

A comparison of the facts from similar cases in the Ninth Circuit is illustrative. In <u>United States v. Butler</u>, 249 F.3d 1094, (9th Cir. 2001), the court considered the question of when "a 'border inspection detention' may have evolved into 'custody' triggering the requirement of Miranda warnings prior to questioning." <u>Id.</u> at 1096. In <u>Butler</u>, the defendant drove his car into the United States from Mexico and was stopped by an inspector at the border, asked a series of questions, and then directed Butler to drive his vehicle to the secondary inspection area for further inspection. <u>Id.</u> at 1096–97. At secondary, another inspector looked inside the car and asked the defendant some additional questions about his reasons for traveling to Mexico and his where he visited while there. <u>Id.</u> at 1097. When the defendant provided non-credible answers, the inspector ordered defendant out of his vehicle, frisked him, and escorted him to the foyer of the security office. There, the defendant was taken into the pat-down room and a more thorough search was conducted, before defendant was placed into a locked "open-screen" cell inside the pat down room. <u>Id.</u> Thereafter, the defendant was questioned again in the holding cell by a senior inspector, without being advised of his rights. The defendant moved to suppress only the statements he made to the senior inspector, after being taken into the holding cell.

Based on the "objective circumstances of the interrogation," the court held that the defendant was in custody when he was locked in the holding cell and had his shoes and belt confiscated. <u>Id.</u> at 1101. Therefore, the defendant should have been provided with his <u>Miranda</u> warnings before further questioning ensued once he was in the holding cell.[5] The court compared a number of other scenarios in reaching its decision. In <u>United States v. Leasure</u>, the defendant moved to suppress statements she made to an inspector stationed at the border, who stopped and questioned her as she drove into the United States from Mexico. 122 F.3d 837 (9th Cir. 1997). When a drug dog alerted the inspector to the possible presence of narcotics, the inspector ordered the defendant out of her vehicle and escorted her to a secondary inspection area. Denying the defendant's motion, the court held that statements made to the border inspector should not be suppressed, as "[i]n most cases, the earliest that a person could be in custody is at the point when she is moved into a secondary inspection area and asked to exit her

---

[5] <u>Butler</u> also noted that while "the existence or non-existence of probable cause might be one factor to consider in determining someone's custodial status in the twilight zone between detention and custody, what ultimately matters to the determination of whether Miranda is triggered is custody, which is determined not by the existence of probable cause," but by the objective circumstances of the detention. <u>Id.</u> at 1099.

vehicle while it is searched." <u>Id.</u> at 840. While the defendant in <u>Leasure</u> had been delayed for questioning and a search of her belongings, and was not free to go, she was not "jailed, handcuffed, or subjected to anything besides inconvenience and delay." <u>Butler</u>, 249 F.3d at 1099.

The Ninth Circuit also addressed the question of when a detention became a custodial detention in <u>United States v. Doe</u>, 219 F.3d 1009 (9th Cir. 2000). There, the defendant arrived in a vehicle from Mexico at a port of entry station, seeking to enter the United States. After the inspector became suspicious about the unusual gas tank on the defendant's truck, the defendant and his fellow passenger were taken to a detention area in the security office, where they were searched for contraband and then seated on benches. <u>Id.</u> at 1012. After a customs inspector found marijuana in the gas tank of the truck, the defendant and his companion were moved from the benches were they were sitting and placed in detention cells. <u>Id.</u> A few hours later, government agents proceeded to ask the defendant a series of questions before reading the suspect his <u>Miranda</u> rights. <u>Id.</u> at 1012–13. While the court held that defendant was not in custody during the time he was awaiting the results of the inspection of his truck, once the marijuana had been found and the defendant placed in a locked cell, the court found that "no reasonable person would have believed he was free to leave." <u>Id.</u> at 1014.

Other decisions hold that the state of being handcuffed, standing alone, is insufficient to turn a detention into custodial detention. <u>See</u> <u>U.S. v. Bravo</u>, 295 F.3d 1002, 1010 (9th Cir. 2002) ("handcuffing alone is not determinative"); <u>United States v. Booth</u>, 669 F.2d 1231, 1236 (9th Cir. 1981) ("Handcuffing a suspect does not necessarily dictate a finding of custody. Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody."). However, "handcuffing is a substantial factor in determining whether an individual has been [placed into custody]." <u>Bravo</u>, 295 F.2d at 1010. In <u>Bravo</u>, the defendant entered the United States from Mexico in a 1981 Chevrolet Silverado. After an inspector asked Bravo a few basic questions, a drug dog alerted to the toolbox in the bed of his pickup truck. The inspector asked Bravo to exit the vehicle and briefly frisked his waist area before handcuffing him and leading him to the security office to await the results of the inspection of his truck. <u>Id.</u> at 1004–05. Bravo was told that the handcuffs would be removed once they reached the office, and that the handcuffs were for the officer's and Bravo's safety. <u>Id.</u> at 1005. He was also told that he would be free to go if nothing was found in his truck. <u>Id.</u> Upon reaching the office, the handcuffs were removed and Bravo was left in the security office, unhandcuffed. After drugs were found in Bravo's vehicle, he was moved to a holding cell and apprised of his <u>Miranda</u> rights. <u>Id.</u> Bravo argued that he was not merely detained but *arrested* while awaiting the search of his vehicle, and as such, the officers' needed probable cause for his detention pursuant to the Fourth Amendment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

The court held that "the combination of the handcuffing, frisk, pat-down, and shoe search" did not transform the defendant's border detention into an arrest. Id. at 1010. The court compared the situation that Bravo encountered to other cases where suspects were escorted to a security office to await the results of a search of their vehicle and frisked at the security office, but where the suspect was not handcuffed, at least initially. See id. (citing to Doe, 219 F.3d at 1014; United States v. Juvenile (RRA–A), 229 F.3d 737, 743 (9th Cir. 2000)). In those situations where a defendant was not initially handcuffed, no arrest occurred until after the defendant was either handcuffed to a bench in a locked security office, see RRA-A, 229 F.3d at 743, or after the defendant was moved to a locked security cell, Doe, 219 F.3d at 1014. Thus, although the defendant in Bravo was briefly handcuffed, the court found that this did not transform the defendant's initial detention into an arrest. The court noted a number of mitigating factors supporting its analysis, including the fact that the defendant was told the handcuffs were temporary and only for his and the officer's safety; that the handcuffs would be removed upon arrival at the security office; and that defendant would be free to leave if the search of his truck did not reveal any contraband. Bravo, 295 F.3d at 1011. The court also noted the exigencies of the situation at a border crossing: a defendant could easily flee, customs officers had been shot at before in similar circumstances, and the evidence available to the officer "created an individualized suspicion of illegal activity." Id. Viewing the totality of the circumstances, which included the officer's "reassurances," the court held that "the circumstances of Bravo's detention would lead a reasonable innocent person to believe that he would be free to go once the search was over and he answered any questions." Id.

Considering the totality of the circumstances of defendant's initial detention and questioning in the jetway, the Court concludes that Miranda warnings were not required at this time. A reasonable person would have believed that he would have been free to return to his flight after brief questioning by the officers, even though defendant was handcuffed at the time the questioning took place. A number of factors support this conclusion. First, there is no evidence that threatening language was used to summon defendant from the airplane, or that defendant was confronted with any evidence of guilt on the airplane or the jetway. These facts lend the interrogation on the jetway a decidedly non-custodial character.

Second, this interrogation took place in the same jetway that defendant and his fellow passengers used to board the airplane. At this point in time, defendant had not yet been taken to any "secondary" interrogation location, and he remained in close proximity to the airplane from which he was offloaded. See Leasure, 122 F.3d at 840; Butler, 249 F.3d at 1099.

Third, defendant had been detained at this point for less than fifteen minutes, as defendant was taken off the airplane at approximately 12:20 p.m. and transported to the TBIT by 12:38 p.m. This sort of brief delay or inconvenience is not unexpected with a border crossing. See Butler, 249 F.3d at 1099; Bravo, 295 F.3d at 1009.

Fourth, and importantly, the nature of the questions that Officer Aguirre asked defendant would lead a reasonable person to believe that he would be free to go once the officers asked these questions. Officer Aguirre asked defendant a standard set of questions for an international traveler, including where defendant was traveling, the purpose of his trip, whether he had checked a bag, and whether he was carrying greater than $10,000 in U.S. currency with him. At this time, defendant was asked no additional questions before being told that the officers intended to inquire further about his trip, and that he would need to accompany the officers to another location. Questions of this sort would not lead a reasonable person to believe that his detention would turn into an indefinite one.

Finally, while defendant was handcuffed and patted down during the questioning on the jetway, this fact alone does not transform his detention into a custodial one. As Officer Aguirre testified at the hearing, he believed that the use of handcuffs to remove an individual from a densely populated airplane was a legitimate measure to ensure the safety of defendant, the officers, and his fellow passengers. See Bravo, 295 F.3d at 1011. Moreover, once defendant was removed from the plane and brought to the jetway, defendant remained in a secure area of the airport, justifying additional security measures. And at this point in time, defendant had only been handcuffed for a matter of minutes. See Aguirre Decl. ¶ 17 (estimating that the trip to TBIT took between five and ten minutes, and that defendant arrived at TBIT by 12:38 p.m.). Therefore, on balance, the fact that defendant was handcuffed is not sufficient to turn defendant's detention into a custodial situation. Accordingly, the Court denies defendant's motion to suppress any alleged statements made to the officers on the jetway.

### 3. Alleged Statements to the Officers in the TBIT

Defendant next moves to suppress any statements he allegedly made to the officers while in the interview room at the TBIT. As noted, defendant's handcuffs were removed at this time, and Officer Aguirre placed the contraband-containing bag on the table in front of defendant. Aguirre Decl. ¶¶ 17–18. After asking defendant a series of questions about his luggage and his intended travel plans, Officer Aguirre then proceeded to remove and test for methamphetamine one of the Snickers bars in defendant's presence. The government contends that suppression is inappropriate, as defendant was still not in custody at the time of this interview. Principally, the government argues that a reasonable person would have continued to believe that they would have been free to return to his flight after brief questioning in the interview room. In fact, the government notes, by the time defendant's second interview with Officer Aguirre concluded, defendant could still have caught his flight to Tokyo.

The Court finds that the circumstances surrounding defendant's interrogation in the field office at TBIT are such that Miranda warnings were required, as defendant was in custody at this secondary location. A reasonable person would not have felt free to terminate his

encounter with the authorities after brief questioning at this secondary inspection room. Consideration of the factors discussed previously guides but does not control the analysis.

First, like before, there is no evidence that any of the officers used threatening or intimidating language to bring defendant to the secondary inspection area. Officer Aguirre informed defendant that they intended to ask him additional questions about his trip and that he would need to accompany the officers to another location. This fact weighs against a finding of custody.

Second, based on the evidence in the record, defendant was asked "routine" questions about the purpose of his travel and questions related to his ownership of the luggage and knowledge of its contents, at least at the beginning of the interview. It is conceivable that an individual reasonably could have expected to return to his flight after this "routine" interrogation. However, defendant was directly confronted with evidence of his guilt during this second interrogation. The government contends that this confrontation did not occur until after questioning had ceased. However, Officer Aguirre testified that he asked defendant the reason for traveling with the Snickers bars after he had opened the luggage and the box containing the bars became visible to defendant. By this juncture, defendant was arguably presented with evidence of his guilt. Of course, in domestic and international air travel, it may not seem unusual to have one's suitcase opened up for inspection in front of him or her while being asked questions about its contents. This lessens the extent to which the suitcase itself was evidence of defendant's guilt, although the Snickers bars were arguably such evidence, even before a bar was punctured to reveal the substance inside. This factor thus weighs slightly in favor of a finding of in custody.

Third, defendant was in a secondary inspection area at this point, by the government's own admission. As the Ninth Circuit held in Leasure, it is here—in the secondary inspection location—where a defendant may be in custody for the first time. This is particularly true in the instant case, where defendant was taken to an entirely different terminal for further questioning, physically separated from his departure gate. This sort of spatial separation would make it appear significantly less likely to a reasonable individual that his detention would be coming to an end after a brief round of questioning. And while it is unclear from the record whether the door was locked while the interview was conducted, Officer Aguirre did testify that the door to the interview room was closed. Cf. Butler, 249 F.3d at 1099 (holding that defendant was in custody when he was in a locked holding cell when the questioning occurred); Doe, 219 F.3d at 1014 (same). The location of this interrogation thus weighs in favor of a finding that defendant was in custody.

Moreover, while this second interrogation was brief in duration, defendant had been detained at this point for almost half an hour. While this amount of time is likely not unusual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

for a more extended search of this nature, the amount of time defendant spent with the officers, coupled with the fact that defendant was handcuffed for much of this time, weighs in favor of a finding that he was in custody.

     A final consideration is that defendant's handcuffs were removed once he and the officers arrived at the interview room. This is analogous to the defendant in Bravo, who had his handcuffs removed after he was escorted to the security office to await the results of the officers' inspection of his vehicle. Even though defendant was not handcuffed during his interview, the fact that he had been handcuffed for about twenty minutes prior to his second interview, and that the officers never informed defendant that the handcuffs were merely precautionary and would be removed once they got to the interview room, weighs in favor of finding that defendant was subjected to custodial interrogation.

     Based on the evidence in the record, the Court concludes that defendant was in custody during the entirety of his second interview with the officers. The Court recognizes the important government interest in expeditiously interviewing and briefly detaining individuals who are suspected of carrying contraband across the border, whether by land or by air, and plainly Miranda warnings do not need to be provided immediately in all such circumstances. But although "special rules" apply at the border, in some circumstances a "border inspection detention" may evolve into a custodial detention, requiring that a defendant be apprised of his rights before further questioning ensues. Butler, 249 F.3d at 1098. At this stage, the government's interest in securing the border must be balanced against the important procedural protections against self-incrimination embedded in the Fifth Amendment.

     The fact that defendant was taken in handcuffs to an entirely different terminal by the officers to conduct the interview, in a room that was at least a five minute car ride from his departure gate, supports a finding that this detention was custodial. After being removed from his soon to depart flight, transported in handcuffs, and brought by multiple officers to an interview room in a different terminal, a reasonable individual would not have felt that he would have been free to leave after brief questioning. At this point, therefore, defendant was in custody for purposes of the Fifth Amendment.[6] If defendant was intercepted before boarding

---

[6] While the record is devoid of direct evidence on this score, the officers' subjective beliefs as to the likely guilt or innocence of defendant at the time he was being detained may be relevant to the extent that the officers' conduct towards defendant reflected these subjective beliefs. See Stansbury v. California, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). For example, it is unclear if the officers would have handcuffed defendant—on the flight, jetway, or for the trip to TBIT—if Officer Aguirre had not already

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

his flight and interviewed in an adjacent room, rather than being removed from his flight in handcuffs and brought to an interview room in a different terminal, the outcome of the Miranda analysis may well be different. But given the circumstances of this case, the Court finds that defendant was in custody at the time of this second interview.

Accordingly, because defendant was not provided with Miranda warnings before this second interview took place, any statements allegedly elicited from defendant during this interview must be suppressed.

### 4. Interview with ICE Agents

Because Agent Hernandez properly read defendant his Miranda rights before beginning his interview with defendant, the question remains as to whether Officer Aguirre deliberately employed a "two-step" interrogation method to circumvent Miranda requirements, and provided that such a strategy was not employed, whether defendant's statements to Agent Hernandez were otherwise voluntary. Defendant makes no argument in his moving papers with respect to two-step interrogation. Based on the evidence in the record, the Court finds that no impermissible two-step methodology was utilized and that defendant's statements to Agent Hernandez were voluntary.

The basic precepts are as follows:

> A two-step interrogation involves eliciting an unwarned confession, administering the Miranda warnings and obtaining a waiver of Miranda rights, and then eliciting a repeated confession. If the interrogators deliberately employ the two-step strategy, the district court must suppress post-warning statements unless the interrogators take curative measures to apprise the defendant of his rights; if the two-step method is not deliberate, the post-warning statements are admissible if voluntarily made.

United States v. Narvaez-Gomez, 489 F.3d 970, 973–74 (9th Cir. 2007) (citing Missouri v. Seibert, 542 U.S. 600, 609–10, 622 (2004)). A court may find deliberateness where "objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the Miranda warning." United States v. Williams, 435 F.3d 1148, 1158 (9th Cir. 2006). Relevant objective evidence includes "the timing, setting and completeness of the prewarning interrogation, the

---

determined that defendant likely checked a suitcase containing contraband. Thus, the subjective beliefs of the officers as to defendant's guilt may have led them to treat him, and their interrogation of him, differently than a "routine" border search.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

continuity of police personnel and the overlapping content of the pre- and post-warning statements." Id. at 1159. To assess whether a statement is voluntarily made for purposes of the Fifth Amendment, a court must assess the totality of circumstances including "both the characteristics of the accused and the details of the interrogation." Id. at 1153, n. 5 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973)).

Here, the Court finds no evidence of deliberateness and therefore concludes that any post-Miranda statements should not be suppressed. The first two brief interviews were conducted only by personnel from Customs and Border Patrol, and the questions asked of defendant appear to be routine for individuals traveling internationally. Officer Aguirre then finished interviewing defendant and waited for ICE Agents to arrive to conduct a more complete interrogation, which proceeded only after defendant was apprised of his rights. See Navarez-Gomez, 489 F.3d at 974 (discussing "the informal setting and brief nature of [the initial officer's] prewarning interrogation, [the second officer's] involvement only during the post-warning interrogation, and the lack of any reference to the prewarning statements during the more comprehensive post-warning interrogation" as well as the "change in setting and time span of approximately four hours between statements"). While the time span between the interrogation by Officer Aguirre and Agent Hernandez is shorter here than the two interrogations at issue in Navarez-Gomez, this fact alone does not support a finding that the officers deliberately attempted to circumvent defendant's Miranda rights. Cf. Seibert, 542 U.S. at 616 (finding that the unwarned interrogation there "was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill"). In addition, there is no evidence that defendant made any statements to Hernandez involuntarily for purposes of the Fifth Amendment. Accordingly, the Court concludes that defendant's statements to Hernandez should not be suppressed.

     **B.**     **Suppression of Physical Evidence**

Defendant also moves to suppress all evidence allegedly seized as a result of his un-Mirandized custodial interrogation, including his passport, boarding pass, the baggage claim number on the boarding pass, the checked luggage itself, and all of the contents of the luggage, including the methamphetamine. Defendant argues that this evidence should be suppressed officers lacked any reasonable suspicion to search his luggage, and because this evidence was impermissibly obtained in violation of his Miranda rights.

The Court concludes, however, that none of the physical evidence should be suppressed. In the context of a passenger departing on an international flight, reasonable searches of checked luggage without probable cause or a reasonable suspicion are generally allowed. As the Court has noted, special rules apply at "the border" in conducting a Fourth and Fifth Amendment analysis, Butler, 249 F.3d at 1098, which includes the "functional equivalent" of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

the border, United States v. Abbouchi, 502 F.3d 850, 855 (9th Cir. 2007). In particular, "customs officials may conduct searches at the international border to identify the illegal transportation of contraband or undeclared articles across the border." U.S. v. Seljan, 547 F.3d 993, 999 (9th Cir. 2008) (en banc). "Because [these] searches . . . of both inbound and outbound persons or property are conducted pursuant to the long-standing right of the sovereign to protect itself, they generally require neither a warrant nor individualized suspicion." Id. (quotations omitted). Therefore, these searches are deemed "reasonable simply by virtue of the fact that they occur at the border." United States v. Flores-Montano, 541 U.S. 149, 152–53 (2004) (quoting United States v. Ramsey, 431 U.S. 606, 616 (1977)). However, if a particular search of a person is "highly intrusive" or a search of property is particularly "destructive," "some level of suspicion" on the part of the authorities may be required before a search is permissibly conducted. Id. at 152, 155–156; see Seljan, 547 F.3d at 1000 ("We decline the government's invitation to decide this case by holding that, at the border, anything goes.").[7]

The facts of this case fall squarely within the government's authority to conduct searches at the border without a warrant or individualized suspicion. Officer Aguirre opened up defendant's luggage, removed the Snickers box, opened up the box, and removed a single Snickers wrapped-bar from the box to test for contraband. After conducting his search, Officer Aguirre repackaged the Snickers bars and placed the box back in defendant's luggage. This is precisely the sort of minimally destructive search that border patrol officers are allowed to conduct at international gateways without any individualized suspicion, not the sort of "highly destructive search[] of property or intrusive search[] of the person" that may require something more. Seljan, 547 F.3d at 1003 (holding that a search without probable cause or individualized suspicion of personal letters sent internationally is permissible, noting that the defendant "voluntarily gave the package containing the letter to FedEx for delivery to someone in the Philippines, with knowledge that it would have to cross the border and clear customs").[8] Here,

---

[7] In addition, "administrative searches" of all domestic and international passengers, including their luggage, are permissible without probable cause. As the Ninth Circuit has recognized in this context, airport security screening and searches pursuant thereto are "constitutionally reasonable administrative searches[,] because they are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft." United States v. Aukai, 497 F.3d 955, 960 (9th Cir. 2007) (en banc). "[W]here an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, 49 U.S.C. § 44901, all that is required is the passenger's election to attempt entry into the secured area of an airport." Id. at 962.

[8] Similarly, the customs officers had the right to inspect defendant's boarding pass, passport, and baggage claim number on his boarding pass as a matter of course, since defendant voluntarily presented himself for international travel.

defendant voluntarily checked his bag on an international flight, with the understanding that his luggage was subject to a reasonable search, and the actual search that took place was minimally invasive and non-destructive. Accordingly, the Court finds that the search of defendant's luggage was not unreasonable and did not violate the Fourth Amendment.

In addition, the Court finds that the Fifth Amendment does not require the suppression of the subject physical evidence, contrary to defendant's argument. The Supreme Court has squarely held that the failure to give an individual <u>Miranda</u> warnings does not "require suppression of the physical fruits of the suspect's unwarned but voluntary statements." <u>United States v. Patane</u>, 542 U.S. 630, 634 (2004). As discussed previously, there is no evidence that defendant's statements to either Officer Aguirre or Agent Hernandez were involuntary, and therefore there is no basis for suppressing any physical evidence obtained based on any statements that defendant allegedly made. Accordingly, the Court concludes that no physical evidence should be suppressed.

## V.    CONCLUSION

In accordance with the foregoing, the Court GRANTS in part and DENIES in part defendant's motion to suppress. Any statements defendant allegedly made to Officer Aguirre during the second interview, at TBIT, shall not be introduced by the government at trial. Defendant's motion is denied in all other respects.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |